```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
 ------------------------------------x

  HUANG & ASSOCIATES, P.C.,

                    Plaintiff,              MEMORANDUM & ORDER
                                             21-CV-4909(EK)(RER)
              -against-

  HANOVER INSURANCE CO.,

                    Defendant.

 ------------------------------------x
```
ERIC KOMITEE, United States District Judge:

        Plaintiff Huang & Associates, P.C., a law firm, represented the buyer in a real-estate transaction that went badly.  During the closing process, unknown individuals obtained access to an email chain relating to the disbursement of funds.  The lawyers at Huang failed to notice, and the fraudsters absconded with over $500,000 of the client's funds.  In an underlying lawsuit filed in New York state court, the client sued the law firm for negligence and legal malpractice.

        Huang & Associates' insurer, Hanover Insurance Company, denied coverage under the law firm's professional liability insurance policy.  The firm then brought this action to compel Hanover to defend and to indemnify it and to recover damages.  Hanover now moves to dismiss the complaint on the basis of a policy exclusion for claims "arising out of" or "relating . . . to" any attempt to convert or to misappropriate

monies or property.  For the reasons set forth below, that motion is granted.[1]

## I.   Background

**A.   The Real Estate Transaction**

Huang & Associates represented the buyer, Liting Zhang, in connection with Zhang's purchase of certain Staten Island real property for $958,000.  Compl. in *Zhang v. Law Office of Jingcong Wu, P.C.* ¶¶ 12, 14, 17, ECF No. 1-3.  While in the hands of the sellers, the property was subject to a mortgage loan of $529,950.08, owed to EastWest Bank.  *Id.* ¶ 13.  Zhang obtained a $650,000 loan from the Bank of England.  *Id.* ¶¶ 15-16.[2]

The parties scheduled the transaction closing for April 1, 2021.  *Id.* ¶ 18.  Over the preceding week, the parties exchanged a series of emails.  *Id.* ¶¶ 19-24.  Zhang alleges that at points in this email chain, the Bank of England's attorney mistyped the email addresses of the sellers' counsel by transposing some letters, which enabled unknown individuals to circulate a "payoff statement" that purported to come from EastWest.  *Id.* ¶ 24.  This statement identified an unrelated law

---

[1] Hanover also moves to stay discovery in light of its motion.  Because I grant the motion to dismiss, the motion to stay discovery is denied as moot.

[2] The "Bank of England" appears to refer to a U.S.-regulated bank based in England, Arkansas, not the central bank of the United Kingdom.

firm located in Washington State as the proper recipient of the payoff in satisfaction of the seller's EastWest mortgage. *Id.* The closing agent then sent $529,950.08 to the Washington State law firm. *Id.* ¶¶ 32, 35. That firm then wired those funds out of the country, where the trail is said to end. *Id.* ¶ 35.

**B.   New York State Allegations**

Zhang subsequently filed the underlying lawsuit in New York state court against Huang & Associates. He also named as defendants the sellers' counsel, the Bank of England's counsel, the sellers, the closing agent, the Washington State law firm that received the funds and wired them on, and other unidentified defendants. *Id.* ¶¶ 37–72.

Zhang named Huang & Associates in Counts One, Two, and Four of her complaint. All three counts alleged that the firm failed properly to oversee and to conduct the transaction. Count One alleged that the firm negligently failed "to ensure that the emails confirming details of the Transaction were protected from outside interference" by, *inter alia*, confirming the accuracy of the email addresses and the validity of the payoff statement. *Id.* ¶¶ 37–41. Count Two alleged that the firm negligently failed properly to supervise the closing and to "ensure that the Loan Proceeds were properly disbursed at the Transaction." *Id.* ¶¶ 42–46. Count Four alleged that the firm committed legal malpractice in its failure to ensure the email

3

addresses' accuracy, to confirm the validity of the payoff statement, and to prevent the funds from being wired to a law firm unrelated to the transaction. *Id.* ¶¶ 51-55.

At all relevant times, Huang & Associates was party to an attorney's professional liability insurance policy issued by Hanover. Compl. ¶ 1, ECF No. 1. That policy covered claims "arising from a wrongful act in the rendering of or failure to render professional services," including services "render[ed] as a lawyer." *Id.* ¶¶ 23-24; Insurance Policy 7, 12, ECF No. 1-1.[3] However, Exclusion 1.g of that policy provided that the policy would not apply to any claim that was:

> Based upon or arising out of, or relating directly or indirectly to . . . [a]ny actual or alleged conversion, commingling, defalcation, misappropriation, intentional or illegal use of funds, monies or property . . . .

Insurance Policy 12-13.[4]

Huang & Associates reported the complaint to Hanover for coverage under its policy. Hanover Denial Letter 1, ECF No. 1-2. Hanover denied coverage on all three Counts based on Exclusion 1.g. *Id.* at 3-5. The firm then filed the instant lawsuit against Hanover in this court, seeking to recover

---

[3] Page numbers in citations to record documents refer to ECF pagination rather than the documents' native page numbers.

[4] Huang & Associates' policy also contained an endorsement providing coverage for "network or information security breaches." Compl. ¶¶ 25-26; Insurance Policy 33. The parties have not argued that the presence of this endorsement materially affects the analysis in this case.

4

damages from Hanover's failure to defend the case and to compel Hanover to defend and indemnify the firm.  Compl. ¶ 7-8.

On February 17, 2022, the Richmond County Supreme Court granted Zhang's unopposed motion to discontinue her claims against Huang & Associates without prejudice.  Order, *Zhang v. Law Office of Jingcong Wu, P.C.*, Index No. 151220/2021 (N.Y. Sup. Ct. Feb. 17, 2022), Doc. No. 78.  On February 1, 2023, the parties filed a stipulation dismissing all claims in the underlying action.  Stipulation, *id.*, Doc. No. 122.  In response, I directed the parties to advise whether this action or the instant motion had become moot.  Apr. 14, 2023 Order.  Huang & Associates responded that this action was not moot — that the underlying litigation was "still very much extant," though headed for mediation, and that "substantial fees have been incurred to date that Defendant Hanover Insurance Company owes a duty to reimburse."  Pl.'s Letter 1, ECF No. 22.  Later that day, Hanover asserted that its motion to dismiss was accordingly not moot, either.  Def.'s Letter 1, ECF No. 23.

Based on these representations, Hanover's motion is not moot.  *See Stokes v. Vill. of Wurtsboro*, 818 F.2d 4, 6 (2d Cir. 1987) ("Claims for damages or other monetary relief

5

automatically avoid mootness, so long as the claim remains viable.").[5]

## II. Legal Standards

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the court's task is to assess the legal feasibility of the complaint." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). In doing so, the Court "must take the facts alleged in the complaint as true, drawing all reasonable inferences in [the plaintiff's] favor." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 91 (2d Cir. 2007). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III. Discussion

### A. Exclusions Under New York Insurance Law

Under New York law, the insurer's duty to defend its insured is "exceedingly broad." *Auto. Ins. Co. of Hartford v. Cook*, 850 N.E.2d 1152, 1155 (N.Y. 2006). "Where an insurance policy includes the insurer's promise to defend the insured against specified claims as well as to indemnify for actual

---

[5] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

liability, the insurer's duty to furnish a defense is broader than its obligation to indemnify." *Seaboard Surety Co. v. Gillette Co.*, 476 N.E.2d 272, 274-75 (N.Y. 1984); *see also Fitzpatrick v. Am. Honda Motor Co.*, 575 N.E.2d 90, 92 (N.Y. 1991) ("[A]n insurer may be contractually bound to defend even though it may not ultimately be bound to pay, either because its insured is not factually or legally liable or because the occurrence is later proven to be outside the policy's coverage.").

The duty to defend can be overcome, though, if the insurer can establish that there is "no possible factual or legal basis" that might lead to coverage. *Villa Charlotte Bronte, Inc. v. Com. Union Ins. Co.*, 476 N.E.2d 640, 641 (N.Y. 1985); *see also Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Eineger, L.L.P. v. Underwriters at Lloyd's, London*, 918 F. Supp. 2d 114, 120 (E.D.N.Y. 2013). One such basis is an exclusion:

> An insurer who seeks to be relieved of the duty to defend based on a policy exclusion bears the heavy burden of demonstrating that the allegations of the complaint cast the pleadings wholly within that exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no possible factual or legal basis upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision.

*Am. Auto. Ins. Co. v. Sec. Income Planners & Co.*, 847 F. Supp. 2d 454, 460 (E.D.N.Y. 2012) (citing *Frontier Insulation Contrs.*

7

*v. Merchants Mut. Ins. Co.*, 690 N.E.2d 866, 868–69 (N.Y. 1997)). Still, "if any of the claims against the insured arguably arise from covered events, the insurer is required to defend the entire action." *Frontier Insulation*, 690 N.E.2d at 869.

"Under New York law, an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *Fireman's Fund Ins. Co. v. OneBeacon Ins. Co.*, 49 F.4th 105, 112 (2d Cir. 2022). "The initial interpretation of a contract is a matter of law for the court to decide, as is the threshold question of whether a contract is ambiguous." *Id.* "[I]nsurance contracts [must] be interpreted according to the reasonable expectation and purpose of the ordinary businessman when making an ordinary business contract." *Gen. Motors Acceptance Corp. v. Nationwide Ins. Co.*, 828 N.E.2d 959, 962 (N.Y. 2005).

Exclusions "are subject to strict construction and must be read narrowly." *Auto. Ins. Co. of Hartford*, 850 N.E.2d at 1156. "[T]o negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that could fairly be placed thereon." *Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d

8

Cir. 2006). "Under New York insurance law, the burden, a heavy one, is on the insurer, and if the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer." *Id.* However, "unambiguous provisions must be given their plain and ordinary meaning." *Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62 F.4th 748, 753 (2d Cir. 2023).

**B.   *Mount Vernon***

Here, the Court must decide whether Exclusion 1.g relieves Hanover of its obligation to defend Huang & Associates in the underlying lawsuit. Specifically, does the loss for which Huang & Associates is seeking coverage "arise out of," or is it "based on," the fraudsters' crime — their conversion or misappropriation of the money?

In 1996, the New York Court of Appeals answered this question in *Mount Vernon Fire Insurance Co. v. Creative Housing Ltd.*, 668 N.E.2d 404 (N.Y. 1996). There, a landlord covered by a general liability policy was sued by a victim of a criminal assault that occurred in the landlord's building. *Id.* at 405. The victim alleged "negligent supervision, management and control of the premises." *Id.* The policy excluded claims "based on Assault and Battery." *Id.*

The Court began by noting its previous holding that "any minor variation in the language between 'arising out of,'

9

. . . and the 'based directly on' language, . . . was too insignificant to permit varying legal consequences." *Id.* at 406. Thus, for their purposes — as well as ours here — the analyses of "arising out of" and "based on" are functionally identical.

The Court then held that, under the circumstances before it, "the language of the policy controls [the] question" of whether the injury was "based on an assault excluded under the policy." *Id.* The Court set out a but-for test: "If no cause of action would exist 'but for' the assault, it is immaterial whether the assault was committed by the insured or an employee of the insured on the one hand, or by a third party on the other." *Id.* at 407. Applying that test, the Court held that "the operative act giving rise to any recovery" against the building owner "is the assault," not the negligent maintenance of the property. *Id.* at 406. Specifically, the Court reasoned that "[m]erely because the insured might be found liable under some theory of negligence does not overcome the policy's exclusion for injury resulting from assault." *Id.* This was true even though "the theory pleaded [by the victim in the underlying lawsuit] may be the insured's negligent failure to maintain safe premises." *Id.*

The holding of *Mount Vernon* controls the outcome of this case. In both cases, the loss was alleged to have happened

10

because of the intentional act of a third party, even if it was made possible (or made easier) by the insured's negligence. Indeed, the language of Exclusion 1.g cuts even more strongly against the insured than did the language in the *Mount Vernon* policy, in that the exclusion here also precludes coverage for claims "relating directly or indirectly to" any conversion or misappropriation of funds.

**C.   *Watkins Glen***

One possible basis for distinguishing *Mount Vernon* is that it involved a different type of insurance policy — a general liability policy, rather than a professional malpractice or errors-and-omissions (E&O) policy.  The best case supporting this distinction is *Watkins Glen Central School District v. National Union Fire Insurance Co. of Pittsburgh, PA.*, 732 N.Y.S.2d 70 (App. Div. 2d Dep't 2001).  In *Watkins Glen*, two students who had been sexually abused by a teacher sued the school district for negligence in hiring, supervising, and retaining the teacher, who had a history of sexual misconduct with students.  *Id.* at 71.  The school district had an errors-and-omissions policy, *see id.*; the defendant-insurer denied coverage based on exclusions "for claims arising from assault and battery" and from "bodily injury and emotional distress." *Id.*  The district sued, seeking to compel the insurer to defend and indemnify it.  *Id.*

11

The Appellate Division concluded that the exclusions did not bar coverage because of the *type* of policy at issue — an E&O policy.  The court began by acknowledging that New York "generally employs a 'but for' test that looks to the nature of the underlying conduct to determine whether a certain occurrence is covered or excluded."  *Id.* at 73 (citing *Mount Vernon*, 668 N.E.2d 404).  As a result, where a general liability policy is at issue, and "the operative act giving rise to potential liability is an excluded intentional sexual assault, then couching the allegations in terms of negligent supervision or hiring will be ineffective to overcome the exclusion in a general liability insurance policy."  *Id.* at 73-74.

But the Appellate Division ultimately rejected the notion that the but-for test applies to E&O policies.  *Id.* at 74.  Such an application, the court reasoned, "would completely undermine the purpose of such errors and omissions coverage."  *Id.*  An E&O policy, per the Appellate Division, "is expressly intended to provide coverage for negligent acts, including negligence in the hiring or supervision of employees."  *Id.*  Thus, despite the teacher's having "acted intentionally in perpetrating the sexual assaults against the two plaintiff students in the underlying action, liability as against the School District is predicated upon its conceptually independent negligent supervision."  *Id.*  Enforcing the exclusions in those

12

circumstances "would effectively eviscerate the errors and omissions policy altogether." *Id.* The court therefore held that the insurer was obligated to defend and indemnify the school district. *Id.* at 75.

Huang & Associates did not cite *Watkins Glen* here. But the malpractice insurance policy at issue here bears strong similarities to the E&O policy at issue in *Watkins Glen*.[6] Thus, *Watkins Glen* should factor into the instant analysis of Huang & Associates' policy. The Second Circuit has instructed that when the New York Court of Appeals "has not ruled on the issue in dispute," a district court is "bound to apply the law as interpreted by New York's intermediate appellate courts unless it were to find persuasive evidence that the New York Court of Appeals would reach a different conclusion." *Covington Specialty*, 62 F.4th at 752. The New York Court of Appeals has

---

[6] Commentators have observed that there is no material difference between E&O policies and attorneys' legal malpractice policies. *E.g.*, 9A Steven Plitt et al., *Couch on Insurance* § 131:1 (3d ed. November 2022 Update), Westlaw ("In the medical and legal professions, [professional liability] policies are commonly referred to as 'malpractice' insurance. Professional liability policies issued to members of other professions are generally styled 'errors and omissions' or 'E&O' policies. There is no substantive difference in the coverage provided under the two types of policies."); *see also Crum & Forster Managers Corp. v. Resol. Tr. Corp.*, 620 N.E.2d 1073, 1078 (Ill. 1993) ("Errors and omissions policies form the equivalent to malpractice insurance for occupations other than those in the legal and medical fields."). *But cf. Watkins Glen*, 732 N.Y.S.2d at 72 (expressly characterizing E&O policies as "provid[ing] malpractice insurance coverage to members of professions *other than* those in the legal and medical fields") (emphasis added).

not answered the question of whether the *Mount Vernon* rule applies in the E&O context.

One way to frame the instant question of New York law, therefore, is this: does *Mount Vernon* constitute "persuasive evidence" that the New York Court of Appeals, faced with the E&O policy from *Watkins Glen* or the malpractice policy at issue here, would reach a different conclusion than the Appellate Division did in *Watkins Glen*?  *See, e.g.*, *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000) ("The holding of an intermediate appellate state court is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.").

Reading *Mount Vernon* and *Watkins Glen* together, I am persuaded that the New York Court of Appeals would indeed apply the *Mount Vernon* rule to the malpractice policy in this case. While *Watkins Glen* confined the *Mount Vernon* rule to cases involving general liability insurance policies, *Mount Vernon* itself suggests that the New York Court of Appeals would apply the *Mount Vernon* rule to insurance policies generally.  In *Mount Vernon*, the New York Court of Appeals answered the following questions certified to it by the Second Circuit:

> 1. Is the language 'based on' narrower than the language 'arising out of' when used in an insurance policy and does the [*U.S.*

14

>  *Underwriters Ins. Co. v. Val-Blue Corp.*, 647
> N.E.2d 1342 (N.Y. 1995)] decision establish
> that neither is ambiguous?
>
> 2. When a third party rather than an
> insured's employee perpetrates an assault,
> is the basis of the victim's claim against
> the insured assault or the negligent failure
> to maintain safe premises?

*Mount Vernon*, 668 N.E.2d at 405. Neither question was cabined to general liability insurance policies. And the *Mount Vernon* opinion never states — and its reasoning nowhere implies — that the decision depended on the genre of insurance policy.

This conclusion is bolstered by the specific policy language here. The plain text of the insurance contract favors Hanover's reading of the exclusion. Exclusion 1.g is not limited to acts of an insured, Insurance Policy 12–13, while other exclusions in the same policy are expressly so limited. Exclusion 1.a, for example, excludes any claim "[b]ased upon or arising out of, or relating directly or indirectly to" "[a]ny **insured** committing any intentional, dishonest, criminal, malicious or fraudulent act or omission." *Id.* at 12 (emphasis in original). Similarly, Exclusion 1.b excludes any claim "[b]ased upon or arising out of, or relating directly or indirectly to" "[a]ny **insured** gaining any profit, remuneration or advantage to which such **insured** was not legally entitled." *Id.* The omission of any restriction in Exclusion 1.g to the acts of an insured strongly suggests the parties' intent to

15

exclude coverage for conversion or misappropriation of funds, even by actors other than the insured itself. *Cf. Quadrant Structured Prod. Co. v. Vertin*, 16 N.E.3d 1165, 1172 (N.Y. 2014) (under the maxim *expressio unius est exclusio alterius*, "if parties to a contract omit terms — particularly, terms that are readily found in other, similar contracts — the inescapable conclusion is that the parties intended the omission").

Thus, in the context of the specific list of exclusions here, it is apparent that the Court of Appeals would apply the rule of *Mount Vernon*, notwithstanding the holding of *Watkins Glen*. *Mount Vernon* squarely held that the question "whether the injury sought to be compensated was based on an assault excluded under the policy" was "control[led]" by "the language of the policy." 668 N.E.2d at 406. Here, for the reasons just discussed, the language of Huang & Associates' policy favors the insurer.

*Watkins Glen*, in contrast, reached its holding by considering the "purpose" of the policy and "rationale behind the intentional act exclusion." 732 N.Y.S.2d at 74. The Second Department's opinion did not even quote the language of the policy exclusion, much less wrestle with it in detail. Moreover, *Watkins Glen* did not explain its conclusion that to apply the exclusion would "completely undermine the purpose" of E&O coverage and "effectively eviscerate the . . . policy

16

altogether." *Id.* There are many scenarios in which E&O and malpractice insurance policies would provide coverage, notwithstanding the application of the *Mount Vernon* rule. At oral argument, I asked Huang & Associates' counsel to venture a guess as to what percentage of malpractice claims involved stolen funds as the result of attorney malpractice. Counsel offered an estimate of greater than 10 percent but less than 25 percent. That estimate would leave the vast majority of possible claims covered even with the exclusion.

In sum, despite the New York Appellate Division's *Watkins Glen* opinion, I am persuaded that the New York Court of Appeals would apply *Mount Vernon*'s but-for rule to the policy language in this case. *See, e.g.*, *Entron, Inc. v. Affiliated FM Ins. Co.*, 749 F.2d 127, 132 (2d Cir. 1984) ("We recognize that the decision of an intermediate state court on a question of state law is binding on us unless we find persuasive evidence that the highest state court would reach a different conclusion. We believe, however, that the court's reasoning in [the intermediate state court's decision] is incorrect and that the [state] Supreme Court would reach a different conclusion.").

17

## IV. Conclusion

For these reasons, Hanover's motion to dismiss is granted. The Clerk of Court is respectfully directed to enter judgment in favor of Hanover and to close this case.

SO ORDERED.

                                                          /s/ Eric Komitee  
                                                     ERIC KOMITEE  
                                                     United States District Judge

Dated:    May 10, 2023  
            Brooklyn, New York